# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

MABREY DUFF,                                    )
       Plaintiff,                             )
                                              )
v.                                              )    No. 3:06-CV-41
                                              )    (Phillips)
LOCKHEED MARTIN ENERGY SYSTEMS, INC.,           )
and BWXT Y-12, L.L.C.,                          )
       Defendants.                            )


## <u>MEMORANDUM OPINION</u>


Plaintiff Mabrey Duff has sued his former employers, Lockheed Martin Energy Systems, Inc. (LMES) and BWXT Y-12, L.L.C. (BWXT), alleging racial discrimination on the basis of his race. Duff claims that (1) he was denied a promotion, and (2) he was subjected to a hostile work environment, all in violation of 42 U.S.C. § 2000e, *et seq.,* (Title VII) and 42 U.S.C. § 1981 as amended. Defendant LMES has moved for summary judgment asserting that there are no genuine issues as to material facts, and that LMES is entitled to judgment as a matter of law on plaintiff's claims. For the reasons which follow, defendant's motion for summary judgment will be granted, and this action will be dismissed against LMES.

## Factual Background

Beginning April 1, 1984, pursuant to a contract with the Department of Energy, LMES managed, operated and maintained the Y-12 facility in Oak Ridge, Tennessee. LMES' contract for operating the Y-12 facility ended on October 31, 2000, and BWXT assumed management and operation on November 1, 2000. Duff, an African-American male, was employed by LMES and the predecessor government contractors at Y-12 from 1982 until October 31, 2000. Duff was employed by BWXT from November 1, 2000 until his discharge on August 4, 2004.

In 1982, Duff was hired as a machine specialist in the tool grinding division at Y-12. In 1985, he transferred to the Security Department as an Inspector. One year later, he bid for and was awarded the position of Lieutenant in the Fire Department. Lieutenants in the Y-12 Fire Department are salaried, non-exempt employees who act as dispatchers in the alarm room. Lieutenants are not governed by a union contract.

Duff's responsibilities while in the Fire Lieutenant position included monitoring the alarm systems from the Fire Department's alarm room, answering 911 calls, dispatching individuals to the site of alarms, and other administrative duties. Further, while a Fire Lieutenant with LMES, Duff served as a Safety Officer. The Safety Officer was responsible for identifying and correcting any unsafe conditions that arose at the scene of incidents to which the Fire Department was responding, and ensuring that equipment used in the field was handled in a safe and proper manner. Duff's supervisors noted that he was

-2-

a "good safety officer" and that he "demonstrated strength" in the "management and administration of on-scene safety and accountability."  In addition to his role as a Safety Officer, Duff also served as a Fire Captain on occasions when the position was temporarily vacant and needed to be filled by overtime.  As a stand-in Captain, Duff had all the responsibilities of a full-time Captain, including responding to alarms, and directing the activities of the Fire Inspectors and Fire Truck Operators working on the shift.

EEO/AA Policies

At LMES, employment was subject to the company's Equal Employment Opportunity/Affirmative Action (EEO/AA) policy.  The policy prohibits discrimination based on race, religion, color, sex, national origin and age.  The policy covered recruitment and employment, promotion, demotion, transfer, layoff and termination, and other working conditions, including maintenance of a work environment free of physical, psychological, and verbal harassment on the basis of age, sex, ancestry, color, disability, national origin, race/ethnicity, religion/creed, or veteran status.  An Employee Concern Response Program (ECRP) was also promulgated in the LMES Employee Handbook. The ECRP encouraged employees to report concerns about EEO/AA matters to their direct manager or the next appropriate level of management.  Concerns could be reported orally or in writing.  Other avenues for reporting concerns included the bargaining unit, Safety and Health representatives, the Y-12 Safety Work Action Team, and the I Care - We Care Program.

-3-

## Hostile Work Environment

Duff's amended complaint asserts that he was subjected to a hostile work environment during his employment at LMES. Duff testified to two occasions in which racial slurs were either directed at, or spoken in his presence. On one occasion, Duff was informed that Larry Lawson, a supervisor (White), had referred to Duff as a "smart-ass nigger." Additionally, Duff testified that he heard a white employee describe a piece of equipment as "nigger-rigged." Duff further alleges that Lawson spoke harshly toward him and threatened to discipline him on multiple occasions without any basis for doing so, including an incident where Lawson wrongful accused Duff of improperly dealing with a sprinkler system alarm. Supervisor Mike Isaacson (White) warned Duff that if he "missed any more alarms," he would be terminated, despite the fact that several white employees had missed alarms without any discipline whatsoever.

## Failure to Promote

On November 5, 1998, LMES posted an opening for two Fire Captain positions at Y-12. The following individuals submitted applications for the vacant Fire Captain positions: Duff, James Russell, Timothy Dougal, George Potprocky, Frederick Winstead, Darrell Lawson and Luis Revilla. Each applicant was interviewed by a panel that consisted of Brock Rains, Ralph Honeycutt and Scott Hackler. Hackler was the Fire Department Chief, Honeycutt was a Shift Commander, and Rains was a Captain at the time of the interviews.

-4-

The interview panel utilized a Targeted Selection Interview Process. The Targeted Selection interview questions related to human factors and judgment, rather than specific job requirements of the position, to determine how applicants would manage situations and projects. Each applicant for the Fire Captain position was asked identical questions, and the interview panel possessed limited discretion to ask follow up questions. Each member of the interview panel scored each applicant's answers to the respective questions. The interview panel, after each interview, convened to arrive at a score for each applicant and to complete the necessary documentation.

Dougal and Potprocky, with interview scores of 45 and 42, respectively, received the highest scores of the seven applicants. The interview panel scored Revilla's interview at 41.25, which was the third highest score. Duff, with an interview score of 32.25, received the lowest grade of any of the seven applicants. The interview panel based its scores for each applicant on the quality of responses given to each identical question. Each member of the interview panel testified that race was not a factor.

In the scoring system employed by the interview panel, applicants received a score of one through five, depending upon the quality of the answer. A five was the highest score for each response and one was the lowest score. Unacceptable responses for each question resulted in a score of less than three. Two unacceptable scores precluded an applicant from being considered for the position.

In addition to receiving the lowest overall score, Duff received two scores below the minimally acceptable score of three. His unacceptable scores related to deficient responses to questions concerning safety and judgment. Honeycutt testified that Duff's interview scores relating to safety and judgment "meant that all three . . . interviewers agreed one hundred percent that the question was not answered adequately." Duff's unacceptable scores barred him from receiving additional consideration for the Captain positions.

In January 1999, Dougal and Potprocky were offered the two vacant Fire Captain positions based upon their interview scores. The promotion offer was rejected by Potprocky. Revilla, who received the third highest interview score, was subsequently offered the position which Potprocky declined. The Fire Captain vacancies were filled by Dougal, who is white, and Revilla, who is Hispanic.

EEOC Charge

On September 1, 1999, with assistance of counsel, Duff filed a charge of discrimination against LMES with the Equal Employment Opportunity Commission (EEOC) alleging that he was denied promotions and was subjected to a hostile work environment because of his race. He was issued a right to sue notice on September 25, 2001, within 90 days of the filing of this lawsuit.

LMES has moved for summary judgment asserting that Duff cannot demonstrate that LMES' proffered reason for selecting more qualified applicants for the Fire Captain positions was pretextual, nor can he demonstrate that he was subjected to a hostile work environment while employed by LMES.

In his response to LMES's summary judgment motion, Duff states that there are genuine issues of material fact with regard to his claim of a hostile work environment, as well as LMES's failure to promote him to the Fire Captain position, thus precluding summary judgment in favor of BWXT.

## Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the court views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank,* 916 F.2d 337, 342 (6th Cir. 1990). A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Entry of summary

judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## Analysis

The order, allocation, and standard of proof in Title VII and § 1981 cases is governed by the three-part analysis set forth in *McDonnell Douglas Corp. V. Green,* 411 U.S. 792 (1973); *Texas Dept. Of Comm. Affairs v. Burdine,* 450 U.S. 248 (1981); and *St. Mary's Honor Ctr v. Hicks,* 509 U.S. 502 (1993). *See also, Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (the same substantive analysis applies to Tile VII and § 1981 claims). Under this analytical framework, the plaintiff bears the initial burden of establishing a *prima facie* case of employment discrimination. *Burdine,* 450 U.S. at 252-53. If the plaintiff succeeds in proving a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the contested action. *Id.* Once the defendant satisfies this burden, the burden shifts back to the plaintiff to show that defendant's proffered reason is really a pretext for discrimination. *Id.* at 254-55. An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was insufficient to motivate the challenged conduct. *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.2d 1070, 1084 (6th Cir. 1984). In challenging an employer's action, an employee "must demonstrate that the employer's reasons are not true." *Smith v. Chrysler Corp.,* 155 F.3d 799, 806 (6th Cir.

1998). The plaintiff at all times bears the ultimate burden of persuasion that the employer's conduct was the product of intentional race discrimination. *Hicks,* 509 U.S. at 510-12.

Failure to Promote Claim

To establish a *prima facie* case of failure to promote, Duff must show (1) that he is a member of a protected class, (2) that he was qualified for the job, (3) that he suffered an adverse employment decision, and (4) that the job was given to a person outside his protected class. *Hopson v. Daimler-Chrysler Corp.,* 306 F.3d 427, 433 (6th Cir. 2002). It is undisputed that Duff is an African-American, and that white employee Tim Dougal and Hispanic employee Luis Revilla received the Captain positions for which Duff applied. It is also undisputed that Duff met the minimum qualifications listed on the job posting.

Once Duff establishes a *prima facie* case, the burden shifts to LMES to offer a legitimate, non-discriminatory reason for the adverse employment action at issue. *Hopson,* 306 F.3d at 433. If LMES meets this burden, then the burden of production shifts back to Duff to demonstrate that the proffered reason is a pretext. *Burdine,* 450 U.S. at 253.

LMES states that the undisputed evidence demonstrates that Dougal and Potprocky, with interview scores of 45 and 42, respectively, received the highest scores of the seven applicants. The panel scored Revilla's interview at 41.25, which was the third

-9-

highest score. Also undisputed is the fact that Duff, with a score of 32.25, received the lowest interview score. Moreover, because Duff provided two unacceptable interview responses, he was given no further consideration for the position. Dougal and Potprocky were offered the two vacant Fire Captain positions based upon their interview scores. Because Potprocky rejected the offer, Revilla was subsequently offered the position that Potprocky declined.

In support of his assertion that he was the superior candidate for the Captain positions, Duff states that Lieutenants have hands-on experience with regard to how the alarm and communications systems work that is highly relevant to the Captain position. Further, as a Lieutenant, Duff was able to serve as a Safety Officer at the scene of incidents and had performed as a stand-in Captain, performing the exact same functions and maintaining the exact same responsibilities as the vacant Captain position for which he was applying. Duff states that none of the other applicants had served as a Safety officer at the time of his candidacy for the Fire Captain position, and none had logged any time filling in as a stand-in Captain. In fact, while serving as a stand-in Captain, Duff states he was responsible for supervising Revilla, who was one of the applicants ultimately awarded the Captain position.

Duff further states that he had a longer tenure at the Y-12 Fire Department than either of the successful candidates. Duff began working in the Y-12 Fire Department in 1986; whereas Dougal began in March 1990 and Revilla began in July 1995. With

-10-

regard to his experience, Duff asserts he was clearly superior to all other candidates for the position, as the successful candidates had less tenure with the Y-12 Fire Department and had no experience as a Safety Officer or filling in as a Captain.

To the extent that interview scores were used to make selection decisions, Duff avers they were the product of a highly subjective scoring mechanism. The questions that were asked were not related to "fire-related" skills or experience, but rather questions measuring personality characteristics such as "how someone thought in their decision-making process." The numerical score that the applicants received for each question, and subsequently their total score, was based on the panelists' subjective opinion as to how the applicants answered the questions. Duff asserts that the subjective criteria were used by LMES to disguise discriminatory action.

LMES acknowledges that Duff can establish a *prima facie* case, but he cannot demonstrate that LMES' proffered reason for its selection of Dougal and Revilla was pretextual, and the court agrees. The uncontroverted evidence indicates that Dougal and Revilla were selected for the vacant Fire Captain positions because of their respective interview scores. Dougal received the highest score while Revilla was ranked third. Also undisputed is the fact that Duff received the lowest interview score, including disqualifying scores relating to safety and judgment. The Sixth Circuit has held that an applicant's interview performance is a legitimate, non-discriminatory reason on which to make a promotion decision. *See Hayes v. Russo,* 1992 WL 78110 (6th Cir. April 17, 1992) (the use

-11-

of interviews as such has been upheld in federal appellate courts is a legitimate, non-discriminatory selection procedure); *McCrary v. Ohio Civil Service Employees Ass'n.,* 2000 U.S. Dist. LEXIS 21386, (S.D.Ohio November 21, 2000) (defendant's selection of applicant based upon interview performance was determined to be a legitimate, non-discriminatory reason).

The record shows that Dougal and Revilla satisfied all the requirements for the Fire Captain position. Their respective credentials included certification as a State Fire Inspector, which Duff did not possess. Duff provides no specific evidence concerning how the Targeted Selection Interview Process was used to disguise discriminatory action. All he offers are conclusory opinions that his service as Safety Officer should have precluded him from receiving unsatisfactory interview scores relative to the safety and judgment questions asked during the interview. Moreover, the undisputed testimony is that the entire interview panel agreed one hundred percent that the questions were not answered adequately. The record contains no evidence that LMES' stated reason for its selection of Dougal and Revilla had no basis in fact, did not actually motivate LMES' selection of Dougal and Revilla, or was insufficient to motivate its employment decision. It is not the court's role to sit as a "super-personnel" department to second guess the propriety of an employer's decisions. *Seay v. Tenn. Valley Auth.,* 340 F.Supp.2d 832, 842 (E.D.Tenn. 2004). An employer has the right to make a personnel decision "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is

not for a discriminatory reason." *McGhee v. Technicolor Dist. Co.,* 2000 WL 1720557 (6th Cir. Nov. 7, 2000).

Duff's attempt to demonstrate pretext by showing that his qualifications were clearly better than either Dougal or Revilla is unpersuasive. Under Duff's theory, LMES selected less qualified candidates merely because of race. But this argument, supported only by Duff's self-serving conclusion that he was better qualified than either Dougal or Revilla, fails to establish pretext as a matter of law. In attacking LMES' explanation, Duff may not rely on "mere personal beliefs, conjecture and speculation." *Chappell v. GTE Products Corp.,* 803 F.2d 261 268 (6th Cir. 1986). Nor can Duff prove pretext by asserting a better business decision could have been made. *Blackwell v. Sun Elec. Corp.,* 696 F.2d 1176, 1179 (6th Cir. 1983). As the Sixth Circuit has stated, "We look to the employer's motivation, not the applicant's perceptions or even an objective assessment, of what qualifications are required for a particular position . . . . Plaintiff's perceptions of his competence and the competence of those competing against him, is irrelevant; the search committees' motivations are key." *Wrenn v. Gould,* 808 F.3d 493, 502 (6th Cir. 1987). The ultimate burden of persuasion that LMES's decision was the product of intentional race discrimination remains with Duff at all times. *Seay v. Tenn. Valley Auth.,* 340 F.Supp.2d 832, 842 (E.D.Tenn. 2004); citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510-12 (1993). Ultimately, Duff is required to prove that the adverse decision would not have been made but for his race. This he has failed to do. Accordingly, summary judgment will be granted to LMES on Duff's failure to promote claim.

-13-

<u>Hostile Work Environment Claim</u>

To establish a *prima facie* case for a hostile work environment, Duff must demonstrate (1) he belongs to a protected group, (2) he was subjected to unwelcome harassment, (3) the harassment was based on race, (4) the harassment affected a term, condition or privilege of employment, and (5) LMES knew or should have known about the harassment and failed to take action. *Moore v. KUKA Welding Sys..,* 171 F.3d 1078-79 (6th Cir. 1999).

A hostile work environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris,* 510 U.S. at 21. In determining whether there was a hostile work environment, courts look to the "totality of the circumstances." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998). "The conduct must be severe enough or pervasive enough to create an environment that a reasonable person would find hostile or abusive." *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 463 (6th Cir. 2000). Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* quoting *Harris,* 510 U.S. at 23. The Supreme Court has consistently held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to

-14-

discriminatory changes in the terms and conditions of employment." *Newman,* 266 F.3d at 405, quoting *Faragher,* 524 U.S. at 788.

Duff testified that on two occasions racial slurs were either directed at, or spoken in his presence. On other occasions, Duff testified that a supervisor spoke harshly toward him and threatened him with discipline without any basis for doing so. A second supervisor warned Duff that if he missed any more alarms, he would be terminated despite the fact that several white employees had missed alarms without any discipline whatsoever.

None of the incidents cited, either individually or collectively, constitutes a hostile work environment. Although Duff can establish the first three elements to a *prima facie* case, he is unable to prove the fourth element to a hostile environment claim – "that the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile or offensive work environment." *Newman v. Fed. Express Corp.,* 266 F.3d 401, 405 (6th Cir. 1999). First, Lawson's alleged use of the word "nigger" in 1991 was an isolated incident not sufficiently extreme to adversely affect the terms and conditions of Duff's employment. Moreover, the word was not used in Duff's presence, but was allegedly said in the presence of another employee who reported it to Duff.

Duff also complains that Lawson spoke harshly toward him at times and threatened to discipline him on multiple occasions. Apart from one incident where Lawson gave Duff a written warning, Duff was unable to offer any specifics about Lawson's alleged

treatment of him.  LMES points out that Duff subsequently appealed the written reprimand and it was retracted.

Duff also asserts that a pipe-fitter working in the Fire Department used the phrase "nigger rigged" when referring to some repairs.  This comment was made in Duff's presence.  Duff, however, failed to make a complaint to either his supervisor or LMES officials in accordance with company policy.  Instead, Duff elected to discuss the matter with the pipe-fitter.  Duff has proffered no evidence concerning how this alleged incident adversely affected the terms and conditions of his employment.  Rather, Duff testified as follows:

> Q    You applied for the position of Captain, and you were not awarded the position, is that right:
>
> A    I applied for the position, that is correct.
>
> Q    All right.  And other than not being promoted to the position of Captain, do you have any other complaints against any of the defendants in this case?
>
> A    No, I don't.  I don't have any, not that I . . . .

It is clear to the court, based on Duff's own deposition testimony, that the conduct about which he now complains was not sufficiently pervasive to create an actionable hostile work environment.  Duff's allegations relate to isolated episodes that occurred over the period of a decade, and were not severe enough or pervasive enough to create an environment that a reasonable person would find hostile or abusive.

Duff also alleges that Isaacson, in 2000, said that if Duff missed any more alarms, he would be terminated, despite the fact that white employees were not treated in a similar manner. However, Duff's testimony shows that Isaacson's alleged comments occurred in 2000, after BWXT became responsible for the management and operation of the Y-12 Plant. Accordingly, LMES cannot be held responsible for alleged conduct occurring after its contract with DOE expired.

In addition, the record shows that LMES exercised reasonable care to prevent and correct promptly any racially harassing behavior. First, LMES implemented policies and procedures designed to create a workplace free from discrimination. These policies and procedures were publicized in handbooks, newsletters and other publications distributed to all employees. LMES thus provided each employee a way to express concerns and problems. There is no evidence that Duff registered complaints with respect to the matters involving Lawson or Isaacson, rendering summary judgment appropriate on these claims. *See Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1014 (7th Cir. 1997) (summary judgment affirmed because plaintiff failed to register a complaint concerning the harassment to which she was subjected); *Barrett v. Applied Radiant Energy Corp.,* 240 F.3d 262, 264 (4th Cir. 2001) (trial court's decision dismissing action affirmed because plaintiff failed to take advantage of an effective harassment policy).

Nor can Duff establish liability against LMES with respect to the alleged comment made by the pipe-fitter. Because the pipe-fitter is a co-employee rather than a

-17-

supervisor, Duff must establish that LMES "knew or should have known of the harassment and failed to take prompt remedial action." *Woods v. Delta Bev. Group, Inc.,* 274 F.3d 295, 298-99 (5th Cir. 2001); *see also, Martin v. Boeing - Oak Ridge Co.,* 244 F.Supp.2d 863, 874 (E.D.Tenn. 2002) (where Judge Jordan recognized that "an employer can be liable [for co-worker harassment] only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known"). Because Duff failed to complain to management about this isolated incident, LMES cannot be held liable for conduct about which it had no knowledge. Accordingly, LMES is entitled to summary judgment on Duff's hostile work environment claim.

Judicial Estoppel

LMES and BWXT jointly filed a second motion for summary judgment asserting that all of Duff's claims against LMES and one of his claims against BWXT are barred by the doctrine of judicial estoppel. In support of the joint motion, defendants state that Duff's claims should be dismissed because of his failure to schedule or disclose them in a bankruptcy proceeding that moved on a parallel track with the inception of this lawsuit. Duff filed for bankruptcy protection while he had a pending EEOC charge against LMES. He received a right-to-sue letter from the EEOC while his bankruptcy case remained pending, and the court discharged Duff from his debts only four weeks before Duff filed this action against both LMES and BWXT. Duff's bankruptcy proceeding, however, contains no mention of any claim he could or might have had against LMES or BWXT. Defendants assert that Duff's failure means he is now judicially estopped from bringing the claims he

-18-

could and should have disclosed to the bankruptcy court, and those claims should be dismissed.

Section 521(1) of the Bankruptcy Code requires a debtor to file "a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs." 11 U.S.C. § 521(1). It is well-settled that a cause of action is an asset that must be scheduled under § 521(1). *See Eubanks v. CBSK Financial Group, Inc.,* 385 F.3d 894, 897 (6th Cir. 2004); *Cusano v. Klein,* 264 F.3d 936, 945 (9th Cir. 2001). Moreover, "the duty of disclosure is a continuing one, and a debtor is required to disclose all potential causes of action." *Browning Mfg v. Mims,* 179 F.3d 197, 208 (5th Cir. 1999).

The doctrine of judicial estoppel "generally prevents a party form prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001). Judicial estoppel "preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship." *Browning v. Levy,* 283 F.3d 761, 776 (6th Cir. 2002).

In *Browning,* the Sixth Circuit described judicial estoppel as barring a party from "(1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position either as a

-19-

preliminary matter or as part of a final disposition." *Id.* at 775. The Sixth Circuit has specifically found that "pursuing a cause of action that was not disclosed as an asset in a person's bankruptcy filing creates an inconsistency sufficient to support judicial estoppel." *Lewis v. Weyerhaeuser Co.,* 2005 WL 1579713 (6th Cir. July 6, 2005) (citing *Eubanks,* 385 F.3d at 894, and *Browning*, 283 F.3d at 775).

Duff has met the two *Browning* factors in that he (1) now asserts a position contrary to the one that he asserted under oath in a prior proceeding by bringing claims he swore he did not have in the statement of financial affairs and schedule of personal property; and (2) the bankruptcy court adopted the contrary position in its order discharging his debts under Chapter 7. As to the first factor, the Sixth Circuit has held that pursuing a cause of action not disclosed as an asset in a bankruptcy filing creates an inconsistency sufficient to support judicial estoppel. *See Eubanks,* 385 F.3d at 898; *Browning,* 283 F.3d at 775. The Sixth Circuit also has held that an order confirming a Chapter 13 plan adopts the debtor's statement that he has no potential causes of action and supports a finding that the second factor has been met. *See Reynolds v. Commissioner,* 861 F.2d 469, 473 (6th Cir. 1988). Thus, Duff's actions in his bankruptcy proceeding and in the present case establish the two factors necessary for the court to apply the doctrine of judicial estoppel to his present claims of discrimination.

Duff contends that his actions are the product of his simple, mistaken belief that a pending EEOC charge, absent a lawsuit, did not constitute an "administrative

proceeding" that needed to be listed on his bankruptcy petition. Duff avers he did not learn that he would be included in this action until after the discharge of his bankruptcy, at which point there was no way to file an amended petition with the bankruptcy court. Duff contends his omission is a sin of simple misunderstanding, not deception or bad faith.

It is well-settled that judicial estoppel does not apply where the prior inconsistent position occurred because of "mistake or inadvertence." *Browning,* 283 F.3d at 776; *New Hampshire,* 532 U.S. at 753. To determine whether the debtor's omission might be deemed inadvertent, the *Browning* court adopted the approach taken by the Fifth Circuit Court of Appeals in *In re Coastal Plains, Inc.,* 179 F.3d 197 (5th Cir. 1999). Under that approach, the failure to disclose a cause of action may be deemed inadvertent where "(1) the debtor lacks knowledge of the factual basis of the undisclosed claims, or (2) the debtor has no motive for concealment." *Browning,* at 776.

Applying this test, Duff's omission may not be deemed inadvertent. It is undisputed that Duff: (1) filed a charge of discrimination against LMES with the EEOC in 1999; (2) filed for bankruptcy in August 2001; (3) received notice from the EEOC of an impending right-to-sue letter in September 2001; (4) was discharged in bankruptcy on November 10, 2001; and (5) filed this action on December 28, 2001.

Duff clearly had knowledge of the factual basis of the undisclosed discrimination claim when he filed his bankruptcy petition. Duff also had a motive to

conceal his claim. Concealment would have preserved an additional asset for him rather than his creditors. However, under *Eubanks*, even if a debtor has knowledge of a potential cause of action and a motive to conceal it, if the plaintiff does not actually conceal it and instead takes affirmative steps to inform the trustee and the bankruptcy court, judicial estoppel is not appropriate because it is unlikely that the omission in the bankruptcy petition was intentional. Here, Duff never sought to amend his bankruptcy schedules, nor did he file a motion or make any other attempt to inform the bankruptcy court of his discrimination claim against the defendants.

Duff asserted a contrary position under oath in his prior bankruptcy proceeding and the bankruptcy court discharged his debts on the basis of the asserted contrary position. Therefore, judicial estoppel is appropriate under *Browning.* Duff has not proffered any evidence of affirmative efforts to inform the bankruptcy court of his claim or to correct the omission of the claim in his bankruptcy filings. Therefore, an exception to the doctrine of judicial estoppel under *Eubanks* would not be appropriate. LMES argues that Duff is judicially estopped from asserting all claims against LMES that are based upon acts that allegedly occurred prior to the date of his bankruptcy discharge in November 2001. The court agrees. Because Duff's claims against LMES terminated with the end of his LMES employment on November 1, 2000 (the date when LMES ceased employing Duff and BWXT became his employer), judicial estoppel mandates dismissal of all claims Duff has asserted against LMES.

## Conclusion

For the reasons stated above, the court finds that defendant LMES is entitled to judgment as a matter of law on Duff's claims of discrimination under Title VII and 42 U.S.C. § 1981. Accordingly, defendant's motions for summary judgment [Docs. 13, 15] will be granted, and this action will be dismissed against LMES.

**ENTER:**

_____s/ Thomas W. Phillips_____
United States District Judge