# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

MABREY DUFF,    )
      Plaintiff,    )
          )
v.    )    No. 3:06-CV-41
          )    (Phillips)
LOCKHEED MARTIN ENERGY SYSTEMS, INC.,    )
and BWXT Y-12, L.L.C.,    )
      Defendants.    )

## MEMORANDUM OPINION

Plaintiff Mabrey Duff has sued his former employers, Lockheed Martin Energy Systems, Inc. and BWXT Y-12, L.L.C. (BWXT), alleging racial discrimination on the basis of his race. Duff claims that (1) he was denied training, (2) he was denied a promotion, (3) he was disciplined and was given a negative performance evaluation, (4) he was put on a temporary leave of absence when he lost his security clearance, and (5) he was fired, all in violation of 42 U.S.C. § 2000e, *et seq.,* (Title VII) and 42 U.S.C. § 1981 as amended. Defendant BWXT has moved for summary judgment asserting that there are no genuine issues as to material facts, and that BWXT is entitled to judgment as a matter of law on all of plaintiff's claims. For the reasons which follow, defendant's motion for summary judgment will be granted, and this action will be dismissed against BWXT.

**Factual Background**

Beginning April 1, 1984, pursuant to a contract with the Department of Energy, LMES managed, operated and maintained the Y-12 facility in Oak Ridge, Tennessee. LMES' contract for operating the Y-12 facility ended on October 31, 2000, and BWXT assumed management and operation on November 1, 2000. Duff, an African-American male, was employed by LMES and the predecessor government contractors at Y-12 from 1982 until October 31, 2000. Duff was employed by BWXT from November 1, 2000 until his discharge on August 4, 2004.

In 1982, Duff was hired as a machine specialist in the tool grinding division at Y-12. In 1985, he transferred to the Security Department as an Inspector. One year later, he bid for and was awarded the position of Lieutenant in the Fire Department. Lieutenants in the Y-12 Fire Department are salaried, non-exempt employees who act as dispatchers in the alarm room. Lieutenants are not governed by a union contract.

DOE Suspends Duff's Security Clearance

In March 2001, DOE suspended Duff's security clearance because of a credit profile that had been prepared by Equifax. DOE alone decides whether to suspend and to reinstate security clearances. BWXT had no input into the decision to suspend Duff's clearance. Because the alarm room where Duff worked as a Fire Lieutenant required a Q clearance, Duff was no longer able to perform his job after DOE's action. At the time, Duff was working as a Lieutenant on the BB shift from 7 p.m. to 7 a.m.

When employees lose their clearances temporarily, it is BWXT's policy to provide them with available uncleared work for which they are qualified at their same rate of pay. Scott Hackler, the Fire Chief, contacted Steve Weaver, a Human Resources representative, to determine what should be done for Duff. Weaver instructed Hackler to see if there was any work available at Duff's pay rate that did not require a clearance. There was not. The only available Fire Department work that did not require a clearance was for Fire Inspectors and Fire Captains. Neither position had the same pay rate as a Fire Lieutenant. A Fire Captain is one step above a Fire Lieutenant, and Fire Inspectors are hourly employees who are governed by a union contract. Duff was put on an unpaid leave of absence in accordance with company policy on April 4, 2001.

Duff's job required him to monitor alarms, so Chief Hackler could not leave the position unfilled. He initially covered the position with qualified Fire Department employees on an overtime basis. To reduce the burden on the Department, Hackler eventually moved Gary Rose into the job. Rose was a Fire Lieutenant who had been working the day shift.

DOE ultimately reinstated Duff's security clearance, and Duff returned to work on June 7, 2001. He asked to be immediately reassigned to the BB shift. However, Gary Rose had made child care arrangements when he moved from the day shift to the BB shift, and needed time to make new arrangements. Hackler therefore placed Duff on the day shift as a Lieutenant at the same pay rate he had been making before DOE suspended his

-3-

clearance. Rose was eventually able to provide alternate care for his children, and Hackler moved Duff back to the BB shift on October 29, 2001.

BWXT subsequently received notice from DOE that Duff's security clearance had been suspended prematurely. Although under no obligation to do so, BWXT requested permission from DOE to reimburse Duff for the time he was on an unpaid leave of absence. DOE granted BWXT's request, and BWXT compensated Duff for the entire time that he had been on unpaid leave. BWXT also allowed Duff to repurchase the accrued vacation that he had cashed out during the unpaid leave of absence.

Fire Captain Position

In May 2001, a three-person interview panel, which included Chief Hackler, selected Peter Ware, an African-American, for a Fire Captain position. Duff alleges that he should have been promoted instead of Ware. At the time Ware was chosen, DOE had not yet reinstated Duff's security clearance. Duff also did not have the state Fire Instructor I license or the in-house equivalent known as Basic Instructor Training (BIT). Duff knew that either the state license or the BIT was required for the job. Ware had the state Fire Instructor I license at the time he applied for the position, and he met all the other job qualifications.

<u>Training</u>

On several occasions, Hackler and Jeff Jolly, Duff's Battalion Chief, had counseled Duff to obtain either the state instructor's license or the BIT. Jolly asked the training captain to do everything he could to schedule the BIT for Duff. Duff was unable to attend the training on one occasion in 2002 because his shift could not be covered, so he complained to Jim Barnes, BWXT's Diversity Manager. Barnes instructed the Fire Department to schedule a training session for Duff. It was scheduled, but Duff did not show up because of a "personal activity." The Fire Department therefore rescheduled the BIT, and Duff eventually completed the training in June 2003.

<u>Performance Rating</u>

Although Duff alleges that he was given a negative performance appraisal for the period covering July 1, 2000 to June 30, 2001, he concedes that most of the unsatisfactory ratings were ultimately removed from the evaluation. There are six different performance rating categories:

EP    consistently exceeds performance standards

FP+    fully performs, and exceeds performance standards a significant amount of the time

FP    fully performs, occasionally exceeds performance standards

FP-    fully performs to standards the majority of the time, but has areas for improvement

CP    only meets performance standards some of the time, improvement necessary

F    failing, substantial improvement required

-5-

Duff initially received an overall "FP-" rating on his performance evaluation for July 2000 - June 2001. Duff complained about the rating to Jim Barnes, who met with Hackler. They determined that several of the below-average individual ratings were related to incidents that had occurred outside the evaluation period, and they agreed that those incidents should be removed from the evaluation. Duff's overall rating was raised to "FP."

One incident, however, was not omitted from the evaluation. Duff owned a men's formal wear business during his employment with BWXT. Sometime after April 2000, Duff asked BWXT's Ethics Officer, Gail Sewell, if he could submit a bid to perform the Fire Department's dry cleaning services. Sewell responded that this would constitute a conflict of interest, and advised Duff that he could not submit the bid. Duff submitted the bid anyway, and exacerbated the conflict of interest by improperly gaining knowledge of the competitor's costs and prices while on duty. Duff therefore received an "FP-" rating in three individual categories on his July 2000 - June 2001 performance evaluation. Although Duff could have been discharged for this incident, he merely received an informal coaching and counseling session, and the incident was noted on his evaluation. The incident did not affect Duff's overall rating, which remained an "FP."

Termination

On August 4, 2004, BWXT discharged Duff because an internal investigation revealed that he had falsified a logbook, and was dishonest during the investigation. BWXT's handbook contains Employee Conduct Rules, which state that the following

-6-

offenses are grounds for immediate discharge: (1) failing to give facts or supplying false information on . . . company documents; (2) dishonesty; and (3) willfully creating a false company or government record. The Handbook further provides that disciplinary action will be taken against any employee who attempts to harm or slander another employee or the company through false or misleading accusations.

As a Fire Department Lieutenant, Duff was responsible for monitoring the fire alarm system and reporting any problems to his Battalion Chief, Jeff Jolly. Y-12's fire alarm system is made up of numerous devices in buildings throughout the site that transmit alarm-related information to transponders, which are also in the field. Each transponder has certain buildings that are connected to it, and each transponder in turn communicates with the Edwards Systems Technology (EST) computer in the alarm room. When a "trouble" signal is communicated to the alarm room it means that there is an active alarm or that a transponder is not communicating properly to the EST computer.

A transponder has two lines of communication (channels A and B) to the buildings that it monitors. As long as one channel is open, the transponder can receive information from the devices in those buildings. If both channels A and B are in "trouble" status, then the transponder is not passing information from the buildings to the alarm room, there is a complete communication failure, and consequently there is no alarm coverage for those buildings. Loss of both channels A and B is an extremely serious condition.

If a transponder has trouble on a channel, the EST computer monitor in the alarm room reflects this as an "active" point. Some active points are just temporary problems, and the transponder will automatically reset itself. This often occurs where there is inclement weather. Certain alarm devices sometimes generate false signals to the transponder. These devices are put on a "reoccurring list." If an active point is related to a device on the reoccurring list, the alarm room Lieutenant does not have to take any action unless the transponder fails to automatically reset. The EST computer prints out pertinent information line-by-line, and Lieutenants such as Duff must be diligent to track down whether an active point is on the reoccurring list, in which case no action is required, or whether there has been a failure on both channels A and B of a transponder, in which case immediate action is required.

Duff missed one alarm sometime in 2000 when he reported to Battalion Chief Mike Isaacson. Isaacson told Duff to pay more attention to detail, but did not discipline him. Duff missed two more alarms in April 2004. On the first occasion, Battalion Chief Ralph Honeycutt worked the night shift with Duff. At shift turnover, he asked Duff why there were so many active points on the EST system. Duff responded that they were just the "regular stuff – nothing to worry about." Honeycutt investigated further, and discovered that Duff had missed an alarm. Because Honeycutt considered Duff a friend, he did not report the incident to Chief Hackler. However, the next time Honeycutt worked with Duff on the night shift, Duff missed another alarm. This incident was not as serious because the alarm was

disabled.  Honeycutt counseled Duff to pay more attention to the EST system, and told him that if he missed an alarm again they were "going to the Chief."

On May 30, 2004, Duff was working his normal BB shift in the alarm room, where he was the only dispatcher on duty.  That night there was a bad storm, with heavy rain.  At approximately 6 a.m. the next morning, James Tucker, the day shift Lieutenant, entered the alarm room to relieve Duff, followed shortly thereafter by Honeycutt, who was working the day shift as Battalion Chief.  Battalion Chief Jolly, who had worked the BB shift with Duff, was also present.  Jolly, Tucker, and Honeycutt heard Duff say that he had just "normal stuff" caused by the storm to report.  Tucker and Honeycutt, however, were concerned about the high number of active points on the EST computer monitor, and soon discovered that Transponder 4-5 had lost communication on both channels A and B.  As a result, there was no alarm coverage for the twelve buildings that were connected to that transponder.  Honeycutt asked Duff what had happened, and Duff responded that he had telephoned Jolly and told him about the communication failure on channels A and B of Transponder 4-5 at 4:10 a.m.  Jolly stated that he did not remember the conversation, and that Duff had only told Jolly that there was "normal storm stuff" during the telephone conversation that they had around 4:10 a.m.  Realizing the severity of the problem, Honeycutt held the night shift over to help investigate.  An ambulance was sent to the transponder, where it was learned that the batteries on the transponder had failed.  The transponder was manually reset, and coverage to the buildings was restored.

Later that morning, Jolly notified Hackler of the outage on channels A and B of Transponder 4-5. He told Hackler that Duff had called him earlier that morning to say that there was normal storm trouble that would clear as soon as things dried out. Jolly stated that Duff did not tell him that there was a communication failure on channels A and B of the transponder.

Jolly discussed what had happened with Scott Vowell, the Assistant Fire Chief. Jolly told Vowell that Duff had missed the outage on May 31. Vowell decided that Duff should be removed from the alarm room until he could be retrained. When Jolly notified Duff that he was going to be retrained, Duff stated that he had communicated the outage to Jolly and that he had logged the information in the Lieutenant's logbook at 4:10 a.m. Jolly then went to look at the Lieutenant's logbook. The logbook had a four-line entry at 4:10 a.m. which appeared to indicate that Duff had, in fact, relayed the information to Jolly. Jolly reported this information to Vowell, and Duff then came out of the alarm room and stated that he had done his job and recorded the information in the logbook. At no time did Duff state that he had made a late entry in the logbook.

Vowell did not remove Duff from the alarm room, and instead initiated disciplinary action against Jolly. Vowell met with Jolly and told him that he was at fault for not properly responding to the loss of communication on Transponder 4-5. According to protocol, Jolly should have immediately dispatched an ambulance to the transponder. Because the Lieutenant's logbook appeared to reflect that Duff had notified Jolly of the

transponder outage at 4:10 a.m., Jolly took responsibility for the incident, even though he continued to insist that he did not remember Duff notifying him of the outage. Vowell gave Jolly a stern verbal warning and began to document the counseling session in writing.

Sometime later that week, Jolly saw Battalion Chief Honeycutt during a shift change. Honeycutt asked Jolly what had happened as a result of the outage on Transponder 4-5. Jolly stated that he had been disciplined for the incident because he did not properly respond to the information that Duff had relayed to him at 4:10 a.m. Jolly repeated that he did not remember Duff telling him about the transponder failure, but that he had to take responsibility because Duff had logged the incident in the Lieutenant's logbook. Honeycutt then told Jolly that he "got hosed." Honeycutt stated that it was clear during the shift change at 6:30 a.m. that Duff did not know about the transponder outage, so he could not have reported the incident to Jolly earlier that morning. Jolly also spoke to Lieutenant Tucker, who stated that Duff had logged much of the entry in the logbook at shift turnover, and not at 4:10 a.m.

Jolly then approached Vowell, and asked if he knew about Duff's late entry. Vowell responded that Honeycutt had already come to him. Vowell obtained written statements from both Honeycutt and Jim Tucker. In his written statement, Honeycutt confirmed what he had already told Jolly – that Duff had reported at shift turnover that the active points were "regular rain points and they would clear on their own, that there was no reason to send someone to check on them." It was only after Honeycutt asked Duff to pull

-11-

up the active points that they discovered that Transponder 4-5 had lost communication on channels A and B.

In his written statement, Tucker said that Duff had reported only that the active points "were caused by the rain storm." Tucker also stated that he had looked at the Lieutenant's logbook when he came into the alarm room that morning, and that Duff had only made a one-line entry at 4:10 a.m. The entry did not reflect that Transponder 4-5 had lost communication on channels A and B. Moreover, Tucker said that Duff first realized during shift turnover that there had been an outage on the transponder.

Vowell apprized Chief Hackler of the situation, and Hackler instructed Vowell to contact Steve Weaver in the Human Resources Department. Vowell gave Weaver the statements that he had received from Honeycutt and Tucker as well as a copy of the Lieutenant's logbook from May 30-31, 2004.

Weaver began an investigation, and met with Duff on June 16, 2004. Duff, Weaver, Vowell, and Steve Long, a Human Resources representative, were present during this meeting. Weaver asked Duff three times when Duff had made the four-line entry in the Lieutenant's logbook. Each time, Duff said that he had made the entry at 4:10 a.m. It was only after Weaver confronted Duff with the witness statements, and then asked him yet again, that Duff finally admitted that he had made a late entry. Duff still maintained,

however, that at 4:10 a.m. he had verbally communicated to Jolly by telephone that Transponder 4-5 had lost communication on channels A and B.

On June 17, 2004, Weaver met with Jeff Jolly. Vowell and Long were also present. Jolly told Weaver that he did not remember Duff telling him at 4:10 a.m. that there had been an outage on channels A and B of Transponder 4-5, but that he had accepted responsibility because Duff had entered the information in the logbook.

That same day, Weaver met with Honeycutt, Vowell and Long. Honeycutt again stated that it was clear at shift turnover that Duff did not know that there had been an outage on channels A and B of Transponder 4-5. Rather, Duff realized it for the first time in the presence of Jolly, Tucker and Honeycutt. However, Honeycutt could not say for certain when Duff had made the entries in the Lieutenant's logbook.

On June 18, 2004, Weaver, Vowell and Long met with Jim Tucker. Tucker stated that he had looked at the Lieutenant's logbook shortly after Tucker entered the alarm room at 6:00 a.m. on May 31, and Duff had only made a one-line entry at that time. Duff made the additional three-line entry later that morning.

On July 2, 2004, Weaver met with Duff a second time, along with Janet Sexton, another Human Resources representative. Weaver asked Duff to show in the logbook exactly when he had made the late entry. Duff stated that he had entered the first

-13-

line at 4:10 a.m., and then entered the remaining three lines between 6:30-6:45 a.m. Weaver asked Duff to indicate this sequence of events on the logbook page, and Duff did so. If a Lieutenant makes a late entry in the logbook, he is supposed to write "Late Entry."

At some point during the investigation, Duff called Jim Barnes and told Barnes that he believed he was being treated unfairly. Barnes asked Duff to put his concerns in writing, which he did. Once Barnes received Duff's written memorandum, he met with Steve Weaver. Barnes and Weaver investigated each of the issues that Duff had raised. Duff first complained that the EST computer system improperly recorded another Lieutenant's initials on the night in question, but Duff has since acknowledged that this did not affect his ability to read the EST data. Next, Duff stated that the Fire Inspectors had not been given sufficient training to read the transponders correctly. Although it is true that the Inspectors had not received updated training, that did not affect Duff's ability to do his job – the transponders are in the field, and Duff is not even able to see them.

Finally, Duff complained that three other Fire Department employees, Pam Layne, Junior Lane, and James Tucker, had not been disciplined for missing an alarm. Weaver and Barnes investigated, and learned that Tucker and Lane had both missed an alarm during their employment at Y-12. They were verbally counseled, but did not receive formal discipline. Pam Layne did not miss an alarm. Rather, she was performing a training procedure and did not follow a step in the written instruction, for which she was verbally counseled. Weaver did not consider Tucker, Lane, and Layne to be similarly-situated to

-14-

Duff because they had never been accused of falsifying a company document or of being dishonest during a company investigation.

After Weaver completed the investigation, he discussed his findings with his boss, Olga Henley. Weaver also spoke with Hackler, Barnes, and Paul Wasilko. Weaver told them that Duff had denied making a late entry several times in the first meeting, and only admitted to doing so after being told about the witness statements that contradicted his story. In addition, Honeycutt and Tucker's interviews indicated that Duff did not realize that there had been an outage on channels A and B of Transponder 4-5 when they arrived for shift turnover at approximately 6:00 a.m. on May 31, so that, contrary to Duff's assertion, he did not tell Jolly about the outage at 4:10 a.m. The investigation concluded that Duff had not only been dishonest during the company investigation, but that he had falsified his logbook to shift blame to Jolly. Given the severity of these infractions, Hackler and Wasilko felt that discharge was the appropriate option. When asked, Weaver stated that the facts warranted discharge. Henley and Barnes agreed with this decision. Les Reed and Steve Smith, the Human Resources Division Manager, approved the decision to discharge Duff.

On August 4, 2004, Weaver met with Duff and told him that he was being discharged for falsifying a company document and for being dishonest during a company investigation. Henley, Hackler and Wasilko were also present at the meeting.

-15-

EEOC Charge

On September 1, 1999, with assistance of counsel, Duff filed a charge of discrimination against LMES with the Equal Employment Opportunity Commission (EEOC). He was issued a right to sue notice on September 25, 2001, within 90 days of the filing of this lawsuit. On April 1, 2005, Duff filed a charge of discrimination and retaliation against BWXT pertaining to his termination in August 2004. A right to sue notice was issued on June 24, 2005.

BWXT has moved for summary judgment asserting that Duff cannot establish a *prima facie* case as to any of his claims, nor can he show that any of BWXT's legitimate business reasons for its actions were pretextual. Duff failed to show up for training that BWXT had scheduled for him; BWXT promoted an African-American to a position for which Duff did not meet the minimum qualifications; Duff received verbal counseling which did not affect his "fully performs" performance rating; and Duff was fired when an investigation revealed that he had falsified a company document and that he had been dishonest during the investigation.

In his response to BWXT's summary judgment motion, Duff states that he does not oppose BWXT's motion with regard to his discriminatory denial of training, promotion, and performance evaluation claims, as well as his retaliation claims, and voluntarily dismisses those claims with prejudice. However, Duff states that genuine issues

of material fact exist pertaining to his discriminatory job assignment and termination claims, thus precluding summary judgment in favor of BWXT.

## Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the court views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank,* 916 F.2d 337, 342 (6th Cir. 1990). A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## Analysis

Duff has abandoned his training, promotion, performance evaluation, and retaliation claims. Only two claims remain against BWXT: the first pertains to BWXT's

inability to reassign Duff to do "uncleared" work in March 2001, and the second pertains to Duff's discharge. As to the first claim, BWXT asserts it did not reassign Duff after DOE suspended his security clearance because there was no available work for a Fire Lieutenant in an uncleared area of the Y-12 Plant, and secondly, BWXT, although under no obligation to do so, reimbursed Duff for the entire time he was on unpaid leave because of DOE's action, so Duff did not suffer an adverse employment action. As to the second claim, BWXT asserts it discharged Duff because an internal investigation revealed that he had falsified a company document and had been dishonest during the investigation. Duff argues that he was treated worse than Battalion Chief Lonnie Wilson, who received early retirement benefits even though he committed an infraction similar to Duff.

The order, allocation, and standard of proof in Title VII and § 1981 cases is governed by the three-part analysis set forth in *McDonnell Douglas Corp. V. Green,* 411 U.S. 792 (1973); *Texas Dept. Of Comm. Affairs v. Burdine,* 450 U.S. 248 (1981); and *St. Mary's Honor Ctr v. Hicks,* 509 U.S. 502 (1993). *See also, Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (the same substantive analysis applies to Tile VII and § 1981 claims). Under this analytical framework, the plaintiff bears the initial burden of establishing a *prima facie* case of employment discrimination. *Burdine,* 450 U.S. at 252-53. If the plaintiff succeeds in proving a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the contested action. *Id.* Once the defendant satisfies this burden, the burden shifts back to the plaintiff to show that defendant's proffered reason is really a pretext for discrimination. *Id.* at 254-55. An

-18-

employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee. *Kocsis v. Multi-Care Management, Inc.,* 97 F.3d 876, 883 (6th Cir. 1996). In challenging an employer's action, an employee "must demonstrate that the employer's reasons are not true." *Smith v. Chrysler Corp.,* 155 F.3d 799, 806 (6th Cir. 1998). The plaintiff at all times bears the ultimate burden of persuasion that the employer's conduct was the product of intentional race discrimination. *Hicks,* 509 U.S. at 510-12.

Reassignment Claim

Duff alleges that BWXT failed to assign him to available jobs on the east end of the Y-12 Plant during his clearance suspension. In March 2001, Duff's Q clearance was suspended by DOE because of an alleged credit problem. The company policy with regard to such situations stated that the organization manager must "assure that the employee is transferred to work not requiring a security clearance provided such work is available, the employee can reasonably be expected to perform the available work, such transfer is consistent with any applicable collective bargaining agreement, and the employee's usual/basic compensation is not reduced." Duff states that at the time his clearance was suspended, there was work available at the uncleared, east end of the Y-12 Plant for Fire Captains. Duff maintains that he was qualified for the Fire Captain positions because he had worked in that position on overtime occasionally throughout his employment at Y-12.

-19-

Duff points to several white employees who had their clearances suspended, including Steve Alexander, Larry Lawson and Steve Slice, who were placed in positions at the east end of the plant in the same general time frame, even when there was only sporadic work for them to perform there. Although BWXT provided back pay for the time Duff was out of work, this only corresponded to his base wages during the time; it did not include the overtime wages Duff alleges he could have earned had he been placed in one of the available Fire Captain positions. Duff avers he was treated differently than white Fire Department employees and suffered an adverse employment action as a result of the overtime wages he was not able to earn.

To make out a *prima facie* case on his reassignment claim, Duff must establish that (1) he was qualified to perform available work, (2) he was subjected to an adverse employment action, and (3) similarly situated white employees were treated better. *See Smith v. City of Salem,* 378 F.3d 566, 570 (6th Cir. 2004). BWXT asserts that Duff cannot identify a similarly-situated white employee who was treated more favorably, nor can he show that suffered an adverse employment action.

Duff does not allege that the suspension of his security clearance was discriminatory. Because the alarm room where Duff worked as a Fire Lieutenant required a Q clearance, Duff was no longer able to perform his job after he lost his clearance. When DOE subsequently notified BWXT that it had suspended Duff's clearance prematurely, BWXT requested permission to reimburse Duff for the time he was on unpaid leave. DOE

-20-

granted BWXT's request, and BWXT paid Duff for the entire time he had been on leave and allowed him to repurchase the accrued vacation he had cashed out.

Duff argues that he suffered an adverse employment action because the payment did not include the overtime wages he could have earned had he been placed in one of the available Fire Caption positions at the east end of the plant. Duff's speculation regarding the potential loss of overtime is insufficient as a matter of law to establish an adverse action. *See Broska v. Henderson,* 2003 WL 21518733 (6th Cir. June 30, 2003) (the denial of overtime does not constitute an adverse action absent evidence reflecting the amount of overtime lost and evidence that similarly-situated employees received the overtime plaintiff was denied); *see also, Montgomery v. Honda of Am. Mfg. Inc.,* 2002 WL 31119683 (6th Cir. September 24, 2002). Duff has proffered no evidence reflecting the amount of overtime lost, nor has he proffered evidence of similarly-situated white employees who received overtime that he was denied.

Duff has also failed to show that he was qualified for a Captain's position in the east end of the plant. When employees temporarily lose their clearances, BWXT will provide them with available uncleared work for which they are qualified at their same rate of pay. Although there was available work for Fire Captains, Duff was a Lieutenant, and BWXT was not obligated to promote Duff to a higher position that paid more than his Lieutenant's job. Moreover, because Duff was a Lieutenant and not a Captain, he was not qualified to perform Captain's work full-time. BWXT would have violated its practice and

its internal policy had it placed him in a higher-paying position during his security suspension.

The persons whom Duff has identified as comparators, Steve Alexander, Larry Lawson, and Steve Slice, are not similarly-situated. Alexander is a Fire Inspector whose employment is governed by a union contract, and Slice was also a Fire Inspector. When their clearances were suspended, BWXT offered them temporary uncleared work as Fire Inspectors. BWXT could not have placed Duff (a non-bargaining unit employee) in a Fire Inspector position without violating the union contract. Lawson was a Fire Captain who worked when Lockheed Martin was the federal contractor at Y-12. Lockheed Martin temporarily placed Lawson in his same position (Fire Captain) at the east end of the plant when DOE suspended his clearance. In contrast, there is only one alarm room at Y-12 and it is located in the west end (secured area), so there was no uncleared work that Duff could perform in his same position as Lieutenant. Duff therefore was not similarly-situated to the Fire Inspectors and Fire Captain who were given work in their same job classification after their security clearances were temporarily suspended. *Mitchell*, 964 F.2d at 583 (a comparator must be "similarly-situated in all respects"). Thus, Duff has failed to establish a *prima facie* case of discrimination regarding his reassignment, and summary judgment will be granted to BWXT on this claim.

<u>Discharge Claim</u>

To establish a *prima facie* case of discriminatory discharge, Duff must show (1) that he engaged in conduct that was the same or similar to conduct engaged in by white employees, and (2) that the disciplinary measures enforced against him were more severe than those enforced against those employees. *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582-83 (6th Cir. 1992).

Duff was terminated for allegedly falsifying a company document and for dishonesty during the investigation. Duff asserts that Battalion Chief Lonnie Wilson was also accused of falsifying a company logbook and initially denying that what he had written was false. Duff states that while he was summarily terminated, Wilson was given the option of early retirement. This is despite the fact that Wilson and Duff were both eligible for early retirement, as both were nearly identical in the factors used in making that decision – age and years of service with the company. Each ultimately reported to Chief Hackler, and the same people were in charge of the discipline investigative process for each, Duff states.

Wilson was terminated, just like Duff, yet Duff contends that Wilson was treated better solely because Wilson was allowed to take early retirement. Contrary to Duff's assertions, he was also offered early retirement. BWXT's Benefits Department notified Duff shortly after his discharge on August 4, 2004 that he could begin receiving retirement benefits on September 1, 2004. Duff elected to defer drawing early retirement

so that he could later receive enhanced benefits, and he has received such benefits since June 2005.

Although Duff uses Wilson as a comparator, BWXT states that its decision to discharge Wilson for his false entry in fact demonstrates that Duff's discharge was not based on his race. Wilson wrote in the Battalion Chief logbook that a Fire Department employee was going to be late because of "car trouble." An internal investigation subsequently revealed that Wilson did not know the real reason for the employee's tardiness, which he readily admitted to Steve Weaver, the Human Resources representative who conducted the investigation. In contrast, Duff missed an alarm and then entered information in the Lieutenant's logbook after the fact in an attempt to shift blame to his supervisor, Jeff Jolly. During Duff's initial interview, Weaver asked Duff three times as to when Duff had made the four-line entry related to the missed alarm. Each time, Duff said that he had made the entry at 4:10 a.m. when the alarm first registered on the EST computer in the alarm room. It was only after Weaver confronted Duff with witness statements, and asked him yet again, that Duff finally admitted that he had made a late entry. The court finds that Duff's conduct was more severe than Wilson's single misstatement, and unlike Wilson, Duff never admitted his wrongdoing. Because Wilson (Caucasian) was discharged for a less serious infraction, Duff has failed to establish an inference of discrimination based on race. *See Mitchell,* 964 F.2d at 583 (the individuals with whom a plaintiff seeks to compare his treatment must "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same

conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it").

Nor can Duff show that BWXT's reasons for his discharge were pretextual. Duff tries to establish pretext by arguing that Steve Weaver had no basis for his belief that Duff had falsified the Lieutenant's logbook and then lied about it. However, during his interview, Duff told Weaver not once, but three times, that he did not make a late entry in the Lieutenant's logbook. Later in the interview, Duff changed his story and admitted to Weaver that he had made an initial one-line entry at 4:10 a.m. and subsequently added three lines at shift change around 6:30 a.m. Duff was never totally honest with Weaver, and Weaver had a reasonable basis to question Duff's veracity after his first meeting with Duff. The record shows that Weaver conducted a thorough, prompt investigation and had a reasonable belief that Duff had falsified the Lieutenant's logbook and had been dishonest about it. *See Duggan v. Orthopaedic Inst. of Ohio, Inc.,* 365 F.Supp.2d 853, 861 (N.D.Ohio 2005) ("The determination of whether an employer reasonably relied on the facts before it does not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action").

Duff's dishonesty is further substantiated by the testimony of Battalion Chief Ralph Honeycutt and Lieutenant James Tucker, who confirmed that Duff did not know there had been a loss of communication on channels A and B of Transponder 4-5 until shift

turnover around 6:30 a.m. Thus, despite his assertions to the contrary, Duff could not have communicated information about the outage to Jolly at 4:10 a.m. Therefore, BWXT had a reasonable belief that Duff had falsified the Lieutenant's logbook and had been dishonest in the internal investigation. *See Hilbert v. Ohio Dept of Rehab. & Corr.,* 2005 WL 280527 (6th Cir. Feb. 4, 2005) (affirming summary judgment; plaintiff's "evidence must show more than a dispute as to the reasons for the discipline; rather, it must provide the jury with evidence that the employer did not honestly believe the proffered nondiscriminatory reasons"). Because Duff has failed to establish either a *prima facie* case or pretext in regard to his discharge, summary judgment will be granted to BWXT on this claim.

Judicial Estoppel

LMES and BWXT jointly filed a second motion for summary judgment asserting that all of Duff's claims against LMES and one of his claims against BWXT are barred by the doctrine of judicial estoppel. In support of the joint motion, defendants state that Duff's claims should be dismissed because of his failure to schedule or disclose them in a bankruptcy proceeding that moved on a parallel track with the inception of this lawsuit. Duff filed for bankruptcy protection while he had a pending EEOC charge against LMES. He received a right-to-sue letter from the EEOC while his bankruptcy case remained pending, and the court discharged Duff from his debts only four weeks before Duff filed this action against both LMES and BWXT. Duff's bankruptcy proceeding, however, contains no mention of any claim he could or might have had against LMES or BWXT. Defendants assert that Duff's failure means he is now judicially estopped from bringing the claims he

could and should have disclosed to the bankruptcy court, and those claims should be dismissed.

Section 521(1) of the Bankruptcy Code requires a debtor to file "a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs." 11 U.S.C. § 521(1). It is well-settled that a cause of action is an asset that must be scheduled under § 521(1). *See Eubanks v. CBSK Financial Group, Inc.,* 385 F.3d 894, 897 (6th Cir. 2004); *Cusano v. Klein,* 264 F.3d 936, 945 (9th Cir. 2001). Moreover, "the duty of disclosure is a continuing one, and a debtor is required to disclose all potential causes of action." *Browning Mfg v. Mims,* 179 F.3d 197, 208 (5th Cir. 1999).

The doctrine of judicial estoppel "generally prevents a party form prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001). Judicial estoppel "preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship." *Browning v. Levy,* 283 F.3d 761, 776 (6th Cir. 2002).

In *Browning,* the Sixth Circuit described judicial estoppel as barring a party from "(1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position either as a

preliminary matter or as part of a final disposition." *Id.* at 775. The Sixth Circuit has specifically found that "pursuing a cause of action that was not disclosed as an asset in a person's bankruptcy filing creates an inconsistency sufficient to support judicial estoppel." *Lewis v. Weyerhaeuser Co.,* 2005 WL 1579713 (6th Cir. July 6, 2005) (citing *Eubanks,* 385 F.3d at 894, and *Browning*, 283 F.3d at 775).

Duff has met the two *Browning* factors in that he (1) now asserts a position contrary to the one that he asserted under oath in a prior proceeding by bringing claims he swore he did not have in the statement of financial affairs and schedule of personal property; and (2) the bankruptcy court adopted the contrary position in its order discharging his debts under Chapter 7. As to the first factor, the Sixth Circuit has held that pursuing a cause of action not disclosed as an asset in a bankruptcy filing creates an inconsistency sufficient to support judicial estoppel. *See Eubanks,* 385 F.3d at 898; *Browning,* 283 F.3d at 775. The Sixth Circuit also has held that an order confirming a Chapter 13 plan adopts the debtor's statement that he has no potential causes of action and supports a finding that the second factor has been met. *See Reynolds v. Commissioner,* 861 F.2d 469, 473 (6th Cir. 1988). Thus, Duff's actions in his bankruptcy proceeding and in the present case establish the two factors necessary for the court to apply the doctrine of judicial estoppel to his present claims of discrimination.

Duff contends that his actions are the product of his simple, mistaken belief that a pending EEOC charge, absent a lawsuit, did not constitute an "administrative

proceeding" that needed to be listed on his bankruptcy petition. Duff avers he did not learn that he would be included in this action until after the discharge of his bankruptcy, at which point there was no way to file an amended petition with the bankruptcy court. Duff contends his omission is a sin of simple misunderstanding, not deception or bad faith.

It is well-settled that judicial estoppel does not apply where the prior inconsistent position occurred because of "mistake or inadvertence." *Browning,* 283 F.3d at 776; *New Hampshire,* 532 U.S. at 753. To determine whether the debtor's omission might be deemed inadvertent, the *Browning* court adopted the approach taken by the Fifth Circuit Court of Appeals in *In re Coastal Plains, Inc.,* 179 F.3d 197 (5th Cir. 1999). Under that approach, the failure to disclose a cause of action may be deemed inadvertent where "(1) the debtor lacks knowledge of the factual basis of the undisclosed claims, or (2) the debtor has no motive for concealment." *Browning,* at 776.

Applying this test, Duff's omission may not be deemed inadvertent. It is undisputed that Duff: (1) filed a charge of discrimination against LMES with the EEOC in 1999; (2) filed for bankruptcy in August 2001; (3) received notice from the EEOC of an impending right-to-sue letter in September 2001; (4) was discharged in bankruptcy on November 10, 2001; and (5) filed this action on December 28, 2001.

Duff clearly had knowledge of the factual basis of the undisclosed discrimination claim when he filed his bankruptcy petition. Duff also had a motive to

conceal his claim. Concealment would have preserved an additional asset for him rather than his creditors. However, under *Eubanks*, even if a debtor has knowledge of a potential cause of action and a motive to conceal it, if the plaintiff does not actually conceal it and instead takes affirmative steps to inform the trustee and the bankruptcy court, judicial estoppel is not appropriate because it is unlikely that the omission in the bankruptcy petition was intentional. Here, Duff never sought to amend his bankruptcy schedules, nor did he file a motion or make any other attempt to inform the bankruptcy court of his discrimination claim against the defendants.

Duff asserted a contrary position under oath in his prior bankruptcy proceeding and the bankruptcy court discharged his debts on the basis of the asserted contrary position. Therefore, judicial estoppel is appropriate under *Browning*. Duff has not proffered any evidence of affirmative efforts to inform the bankruptcy court of his claim or to correct the omission of the claim in his bankruptcy filings. Therefore, an exception to the doctrine of judicial estoppel under *Eubanks* would not be appropriate. Duff has asserted two claims against BWXT. The first pertains to BWXT's inability to reassign Duff to do "uncleared" work at the Y-12 Plant after DOE suspended his security clearance in March 2001; the second pertains to Duff's discharge in August 2004. Because Duff was terminated after the bankruptcy petition was discharged in November 2001, BWXT does not contend that Duff's discharge claim is judicially estopped.

-30-

Duff's reassignment claim, however, clearly arose before Duff filed his bankruptcy petition in August 2001. Duff had knowledge of the factual basis of the reassignment claim no later than April 2001, when he was placed on unpaid leave. Duff's failure to disclose the March 2001 reassignment claim during the course of his bankruptcy proceeding bars him from pursuing that claim in this action.

## **Conclusion**

For the reasons stated above, the court finds that defendant BWXT is entitled to judgment as a matter of law on Duff's claims of discrimination under Title VII and 42 U.S.C. § 1981. Accordingly, defendant's motions for summary judgment [Docs. 10, 15] will be granted, and this action will be dismissed against BWXT Y-12, L.L.C.

**ENTER:**


                    s/ Thomas W. Phillips
                 United States District Judge